Which is In Re Amarin Corporation. Mr. Finkel. Yes. Honors. May it please the court, my name is Robert Finkel. I'm here with the Plaintiff Appellant, Mr. Reese. This is an appeal from a district court order dismissing the complaint, finding that the plaintiff failed to allege with adequate specificity, falsity with regard to public statements on a drug approval application before the FDA. Mr. Finkel, it may just be my own inability to come to grips with this case or this type of case, but it seems to me that the nature of the case, not the specific matter which you and your adversaries are handling or representing clients in before us, but this type of motion to dismiss adjudication is not real susceptible to an oral argument of this kind, given the nature of the various allegations that figure into the ultimate determination, if you understand what I'm getting at. It's kind of difficult for me anyway to foresee being able to pose a lot of questions, which would probably keep us here for the rest of the day. So let me just start by asking you, as you look holistically at your complaint, what is your strongest or are your strongest several statements and or allegations that suggest to us here that the scienter requirement can be met? Well, we start with the meeting with the FDA in July of 2008. This is a significant meeting because they discussed the anticipated protocol for what we call the anchor indication, which is patients with high but not very high triglycerides. They signed off on the trials that were being proposed by Hemring, didn't they? Right, but they said specifically that approval would be a review issue. So what? I mean, what's news about that? That's always the case. No, no, no. It's not always the case because, historically, the FDA had approved drugs just based on proof of efficacy on surrogate endpoints, which means that if you can show, for example, a reduction of cholesterol or triglycerides in a short-term study, what they would do is they would approve the drug for marketing and then require you to do a post-approval study to determine the long-term efficacy. One of the things I was going to ask you, and maybe it's in the nature of my limited understanding of organic chemistry, is part of what you're alleging here, and I'll ask your colleagues the same question, a basic design for equating the rate of triglycerides to the level of triglycerides. It's not. If I may, it's not a design for. What it is is a science of associations between lowering lipids, which are fats in your blood, and long-term cardiac benefit, that historically, and I'm speaking about the year 2000s, you know, that period of time. Everyone puts it on an assumption that there was a correlation, right? Right, but the FDA told them at the meeting in July 2008 that they're seeing a lot of these post-approval studies come in. Oh, go ahead. I'm sorry. I neglected to say that I want to reserve four minutes. If it's too late, that's fine. No, that's fine. The FDA said at that meeting that the studies were coming in and that they were seeing no association between the decline in lipid profiles of non-cholesterol things like triglycerides. We are not aware of any prospective control. That's what they said. We are not aware of. Right. We're not aware of. Right, and they said for. So they're challenging them. You may have an uphill battle here. We're not aware of this. I mean, this is at the very beginning. This is a moving target, and then in 2009 they say a review issue, and then they enter into these agreements. Isn't this the nature of what happens when a drug is presented and the FDA is looking at it? They probably express some cautionary, you know, we're just embarking upon this, and, you know, these studies are going to give us important information, you know, and we're probably not, you know, we may not do something until you're underway with another study. What exactly, how were investors specifically misled? Well, we identified a number. We identified 87 specific statements. But what did investors think was going to happen that the company knew different? Well, investors thought that when the Anchor study was released, which showed proof of efficacy on lowering triglycerides, that the company would get approval to market the drug. Oh, really? And on what basis did investors think that? Based on the company's public statements. The company said specifically that the long-term study was not required for Anchor approval. They said TG lowering, triglyceride lowering. Well, the completion of it was never indicated as being required for approval, because the FDA said you're going to have to undertake it and make substantial, you know, and then they were negotiating whether it was going to be 25 or 50 percent. But the company never said we're not even going to have to embark upon it, did it? No, they said that it had to be substantially enrolled. But they didn't say it had to be completed, and they didn't say that completion was a review issue. So the facts that a reasonable investor would know. The approvability of the indication will be a review issue. Correct. But the company said. Had you done that, you would have sold your stock because it just looks like it's just never going to happen? You wouldn't have bought the stock at the price, but it's not only that fact. You wouldn't have bought in on the chance that this drug, you know, at $20 or whatever, that this drug could, you know, do a lot for people like me. Your Honor, if you knew the course of conduct between the applicant, Ameren, and the FDA, including the minutes, and these are not preliminary minutes, these are final minutes, and only the initial comments to the applicant were preliminary minutes, and that's clear from the face of the document. But the point is not that you had a right to know what's in the minutes. That would go to, you know, everything material must be disclosed. The threshold issue is that you were misled. That's the threshold issue. And only if you were misled do we then decide whether there was a material, what you were calling your misled would have been material to you. I agree, Your Honor, but the. . . I mean, you had no right to really see the minutes. We focused on the reduced hit completion. Break it down by categories. Start with reduced hit completion, the problem with gels, the problems with using mineral oil as a placebo, when that may be a problem, statements that made subsequent to that that would suggest that. There's no problem here in terms of whether or not the mineral oil is under. . . Break it down that way. Maybe that will go to laying out exactly what the misstatements were. Well, we'll start with the anchor trial. The anchor trial was a 12-week trial of surrogate endpoints. They announced that the study was successful, but there were some aspects of the study that indicated that the mineral oil that was used as the placebo in the control group had an impact on the statin, and that was an issue that arose at the advisory committee, and we consider that the failure. To say that the anchor study was successful without also disclosing the company's and the FDA's concern with the use of mineral oil as a placebo was materially false and misleading. And when was that? The anchor study came out around March of 2011. But when did it? I can't remember a name now, but the person who suggested there may be a real problem means it was a study because of the assumption that placebo was under. Well, it came out at the advisory committee hearing in October of 2013, but it posted back to 2011 when those discussions were taking place. The reduced study was a study that would be very, very expensive to do, and to be completed would currently cost about $200 million in six years. By telling Ameren that they had substantial uncertainty, and these are actually Ameren's actual words, substantial uncertainty as to the use of a surrogate endpoint to approve the drug, investors would have understood that there was a material risk that VSEPA would not be approved for the bigger indication until six years hence at a $200 million investment. That's a very different investment calculus than if investors reasonably believed, as they did based on the defendant's public statements, that there was a substantial likelihood that the drug would be approved just based on the surrogate endpoint. There was very little likelihood based on the statements at the meeting in 2008, plus the fact that Accord and Aim High were unsuccessful, that the FDA would approve the drug based just on surrogate endpoints. And if I may, there's a reference that we have in the complaint in the briefing, but it might not be as apparent. There was a teleconference on April 14, 2011, at or about the time of the release of the Anchor Study, in which the FDA told the representatives from Ameren on the call that an advisory committee would be necessary before approval could possibly be granted. An advisory committee in the science is very significant, because sometimes the science is so clear that the FDA will approve a drug without an advisory committee. What the FDA is telling the company in a teleconference in April of 2011 is that because of the uncertainty of the science, we're going to have to convene an advisory committee on this, and we think that approval, even after the advisory committee, is at most possible. There's nothing in the defendant's public statements where you would see that degree of risk. They basically said that we filed the SPA, they used the words that it's an endorsement of our strategy, that the long-term study will not be required to be completed, that triglycerides are approved surrogate endpoints, and all of that is an absolute falsehood to create an illusion to allow them to sell sufficient amounts of stock to do the reduced study. It's an absolute falsehood? Absolute falsehood. If you compare the record to the company's statements, absolute falsehood, it's what I call fraud with a capital F rather than a small f. There's one thing, because I'm out of time, but it's very important that I show your honors. Certainly. On paragraph 137 of the complaint, there's a long discussion from a representative of the FDA, Dr. Jenkins, about why it was that the anchor SPA was identified as a review issue. My adversary is on page 682 of their brief. It's also in the judge's opinion at page 37 of Judge Wolfson's opinion. My adversary, 12 times in their brief, takes this long discussion of why it's a review issue, including the history of the use of surrogate endpoints, and a statement that the FDA made clear to Ameren at the July 2008 meeting that they were in the process of reevaluating the use of surrogate endpoints. And what they do is they just cut out from the middle of a very long paragraph the sentence, quote, at the time of the pre-IND meeting in July 2008, the FDA was still willing to accept TG lowering as a validated surrogate for reducing CV risk. There they close the sentence, period, close quote. But the actual language then says that the FDA made clear to Ameren that there were still concerns. And then later in that same paragraph it says the FDA made clear that it was aware of ongoing outcome trials. My adversary, in the same way that he takes these words out of context, in the complaint, it's paragraph 137, it's on page JA 372 to 373 in the record, in the same way that he takes the good in this paragraph and distorts it by not giving it the proper context, is the same way that defendants in this case said that they were given a clear path to approval by the FDA, whereas the FDA said that it had substantial concerns. You said clear path to approval. Is that your characterization? I admit that's my characterization, but if I can, this is what the defendants actually said. What I'm saying is there's a date, and you may not be able to answer this, but I'm trying to find a date where there's a statement, and I have it on my notes, and I should have recorded the date. It occurred during a conference call with Mr. Ketchum, the following statement was made. Overall, we have seen nothing presented anywhere that has diminished our overall confidence in the clinical opportunity provided by reception. Do you know when that statement was made? It likely is paragraph 381. There's a long discussion on a conference call of what Dr. Ketchum was speaking about. But if I can, just to specify, in paragraph 379 of the complaint, it's a press release. I don't have the date of the press release, but it's sometime in the summer of 2013. The company says, An SPA, a special protocol assessment agreement, is generally considered to be binding upon the FDA, except in limited circumstances, such as if the FDA identifies a scientific issue essential to its determining the efficacy or safety of a drug. That's the first sentence. The FDA had identified such an issue, the accord in the Ameren studies. So that's, you know, you're already starting out with a lack of candor. Then it says, Ameren has not been informed by the FDA of any such essential issue. Ameren believes that it achieved all the requirements of the SPA agreement. Now, an investor does not know what's going on between Ameren and the FDA. An investor doesn't know that the FDA had advised Ameren of such a scientific issue, the accord and the aim high, and the whole science of the use of surrogate endpoints. That has put the entire application for the SEPA, for the anchor indication, this multi-billion dollar indication, at issue. This is, I mean, I agree, Your Honor, it might have been an unfair characterization to say a clear path to approval. But this is, and we have it in the complaint, we have 87 separate statements. This is basically saying we have a clear path to approval. All right. Thank you. We'll have you back on rebuttal, Mr. Finkel. Mr. Rubin. You have a clear path to argument. I appreciate that, Your Honor. May it please the Court, Howard Rubin for Appellees. Your Honor, in a thoughtful, detailed, 46-page opinion, the District Court concluded that the falsity element was not met, consistent with this Court's and the Supreme Court's key decisions. Because that's always an issue that we wouldn't have a job. We just look at the District Court's thoughtful, 46-page opinion, and some can be affirmed. And you certainly are going to review DeNovo. But I know that courts also look at District Court opinions, and his learning here is instructive because he was following your directions in key cases. And you asked a very reasonable question, Chief Judge Smith. I was asking myself in preparing, how does one get their arms around testing the legal sufficiency of a 500- 87-some allegations. And that's no one's fault. It's just the nature of these cases. Absolutely. And I don't think it is anyone's fault. But I think there are two absolutely critical decisions. One is this Court's decision in the City of Edinburgh case from 2014. And the other is actually the Second Circuit's decision in Tong. Because both of those cases were evaluating motions to dismiss of 10B cases in the context of the FDA's drug approval process. And was asking fundamentally the same question that you're now asking yourselves. Did the defendant make a materially false or misleading statement? And I want to dive into- Well, Tong really discussed sophisticated investors, didn't it? And what sophisticated investors objectively can be expected to know or expect, right? So a couple of comments. There's no question that the Second Circuit a couple of times, a few times, referenced the sophisticated investor. But in the key aspects of the decision, it spoke of what a reasonable investor should know in terms of what information has to be disclosed. And consistent with the decision in Matrix from the Supreme Court, silence is not actionable. The question for you is- Well, silence can be actionable if there are certain things known to the defendant entity that have to be revealed in order to not make the silence misleading. Exactly. And so then that goes to the heart of this case. Were there misrepresentations because of a failure of omission such that the duty to disclose would get triggered? Well, I mean, isn't Tong similar to this case at the very least to the extent that what you had was the ongoing process there that you have here? Yes. And that ongoing process should not prevent a defendant from expressing optimism. 100% right. In fact, it's so very similar. In that case, the FDA expressed repeated concerns over a series of years about the fact that Sanofi was using a single-blinded rather than a double-blinded test. And the FDA actually even said, this is going to be a review issue. Our assessment of your drug and your basing it on a single-blinded test will be a review issue. Given the expense of the testing that is required for FDA approval, it would seem rather absurd not to have some measure of optimism of ultimate success if you're going to spend all that money. Absolutely. And particularly after the passage of the PSLRA, it can be that a company expressing that optimism is sufficient to get over the 12B6 hump. In fact, in this court's case, in the city of Edinburgh case, Pfizer, it was actually Wyeth at the time, spoke of the drug, this was an Alzheimer's drug, being a breakthrough drug and that the drug could be transformational for the company. And did not disclose that the results of a Phase II trial didn't really support the announcement that Wyeth was making that they were now embarking on a Phase III trial. And that optimism wasn't actionable. And this court, you actually sat on that panel, Chief Judge Smith, affirmed the 12B6. And so what I think we should do is look at the allegations here. And I want to focus on the two that they spend the most time briefing and the most time at argument today. Well, could you address, and Tom, they talk about the fact that there was nothing, there was no FDA feedback that was out of the ordinary or presented a special challenge, not of the kind normally confronted. Here, your opponent talks about the press release and the fact that Amrit said it knows of no issue, when in fact it did know of an issue that the FDA had communicated to it. Could you address that? Sure. And that really comes from this 2008 meeting minutes. And the two pages that you need to look at are JA483 and 484. And, of course, these are incorporated by reference in the complaint. So you can consider them on a motion to dismiss. The FDA does reference the Aim High, Accord, and Improve It studies. And I'll read you the two key sentences, because this is grossly overstated by appellant and is inconsistent with the document. The Aim High, Accord, and Improve It studies, while not designed to address this specific gap in knowledge, this is my paraphrase now, that relates to whether or not TGs are a circuit end point, it doesn't address this specific gap in knowledge, will provide important information on the incremental benefit of adding a second lipid active drug to statin therapy. But then go to the very next sentence, thus. FDA, after saying the word thus, doesn't say, and thus, we'll need results from those three outcome studies in order to evaluate your drug. They say, thus, before we'd entertain granting the indication, at a minimum we'd require the results of your 12-week study, that's the anchor study, and you would have to have well underway your own outcome study. There isn't a single statement in the record by the FDA saying that reduce it had to be completed. It had to be initiated, it had to be underway. But you're not informing investors that the approval may well be contingent on the outcome of the anchor study. Wouldn't that start leading one toward a road where they would be seduced into a more optimistic view of the chances of this drug being approved than was appropriate? There isn't even an allegation by the plaintiffs in this case that we were suggesting that the anchor study, our 12-week study, wasn't relevant. We were always saying, over and over again in our 10-K filings, that our 12-week study and having an outcome study, reduce it, substantially underway, is what was required for them to consider it. So the notion that it was going to be a review issue in the spas... Let's back up a second. The anchor study is a short-term study. The anchor study is a 12-week study, yes. There came a point when it became pretty clear that the FDA was not going to be content with the short-term study and wanted a longer-term study. Your Honor, respectfully, I don't think that's the case. In the July 2008 minutes, in the very same sentence, they say, we'll consider whether or not we will approve the indication based on the 12-week study and your outcome study being substantially underway. What is the outcome study? Our outcome study is called reduce it. Okay. Our study. Your Honors, this is the quintessential case of fraud. How long is the reduce it study? I'm sorry? How long is reduce it? Our reduce it study was a multi-year study. But they never said we need your results and you have to be completed for us to consider whether to grant. This is the quintessential case of fraud by hindsight. The world changed in October 2013 when the FDA says the science has changed. I want to actually point you to a sentence that appellants quote a piece of over and over again in their briefing. Dr. Jenkins, who issued the appellate decision denying our appeal of the rejection of the 2009 STA, this is the full sentence. He says that this is in September 2014 when he is writing his decision explaining why they're denying our appeal. It defies logic to now claim that the cumulative result, and he underscores the word results, of cardiovascular outcome trials that were ongoing at the time we entered into the SPA agreement cannot be viewed as new scientific information relevant to determining whether decreases in triglycerides are considered a valid surrogate endpoint. In their opening brief on pages 28 and 39, appellants cite, quote, word for word that sentence. They leave out one word. They don't even ellipse it. They leave out the word new. The very heart of this case goes to the fact that in October 2013, even though less than 1% of all SPAs at that time over a 17-year period had ever been rescinded, it very rarely happens. The FDA says that in this instance because at that point, viewed holistically, looking at the results of three other outcome studies, at that moment, FDA says we now have new information. In fact, Dr. Jenkins, in this document, and this is at 685, 687, 689, seven times he says that the decision to rescind the Anchor SPA, quote, was based on the accumulation and totality of the scientific data and information, including re-evaluation and improved understanding of the relevant scientific knowledge. This court has rejected since the days of the Weiner Trust case in 2009, for example, that you cannot survive the motion to dismiss stage by pleading fraud by hindsight, and that's precisely what happened here, given the changes. In fact, my guess is, and you can see from the stuff, but my guess is Mr. Finkel would argue that what ended up as the conclusion of being new was foreshadowed earlier on by some of the meetings and some of the interactions with the FDA where they suggested problems with possibly identification of the circuit endpoint and problems with whether or not you were really using something that was inert. So relying exclusively on what's in the complaint and the documents incorporated by reference, that didn't happen. In 2009 and 2011, the FDA granted these special protocol assessment agreements. The first one, in 2009, was for Anchor, and the FDA said it would make it a review issue analyzing the results of the 12-week study and the fact that they had their outcome study substantially underway. If, for example, at that point, the FDA had changed its mind because science was developing and they felt, you know what, we really need your outcome study results completed, then they wouldn't have said it was a review issue. They would have said, no, we will not consider granting your indication just on your 12-week study and being substantially underway. And then in 2011, additional studies are coming out, but the second special protocol assessment agreement is granted, this time for Ameren's outcome study, reduce it. And yet again, the FDA says it's a review issue. We'll contemplate and consider. And what happens is, October 2013, FDA puts all the science together. In the document, that actually is the formal rescission. In October 29, 2013, it's at JA-373, and again, it's referenced in the complaint so you can consider it. The FDA says the division no longer considers a change in triglycerides as sufficient to establish the effectiveness of a drug to reduce cardiovascular risk. It no longer considers. This court, Tong in the Second Circuit, the Supreme Court... I really read Tong in the company, and I find it not to be all that helpful. The materiality and the difference between a blinded and a double-blinded study, I understand it's there for persuasive value only, but I just have problems with the logic in Tong. Well, respectfully, Your Honor, it's a case where the company is saying the data is nothing short of stunning. They're not revealing the information, and it doesn't survive the 12-week stage. But I would commend to you this court's case, and your cases are the first ones you'll look to, in the city of Edinburgh from 2014, which is the Pfizer case, because there were results that Wyeth was sitting on that the Phase II trial results really didn't support going forward and announcing the Phase III's trial. And there were all sorts of, to your point earlier, Chief Judge Smith, there were all sorts of optimistic statements made. And the Third Circuit, in a unanimous decision, concluded it didn't survive the 12-week stage. Another point to remember, and this is all incorporated by reference in the complaint, is that there are substantial warnings given consistently. If you look at the 2010 case... Yeah, the 2010, 2011... They're very general, though. They're kind of like a pabulum that everyone always says when you're trying to get a drug approved. I'm a year past that, because you know I didn't put that in here. Your Honor, respectfully, the 2011 10-K, bolded and italicized. It says, quote, Our SPA agreements with the FDA are not guarantees of FDA approval of AMR-101, that's Vasepa, for subject indications. And then the next year, in the 2012 10-K, again, bolded and italicized. It goes into even more detail. Our SPAs with the FDA are not guarantees of FDA approval of Vasepa for the proposed Anchor and Reduce-It indications. Well, but that goes without saying. I mean, that's what you say in the 10-K. No assurance can be given, da-da-da-da-da-da. And the question is, were we sitting on information from the FDA that would make it a material representation? The FDA never said you have to complete your Reduce-It study. FDA never put together all of these other studies and concluded that you know what, now the world has changed. And the decision from Dr. Jenkins in 2014, which is relied on so extensively in the complaint, is a perfect example of them saying, we're putting it all together now. The FDA's report to the House Appropriations Committee in 2015, which we cited to you, you can certainly take judicial notice of it, the FDA says in the thousands of special protocol assessment agreements since 1997, less than 1% have been denied. This court shouldn't sanction a case beyond the 12B6 stage that is attacking, through fraud by hindsight, the actions that were taken by Ameren, but only the world changed. It's quintessential Monday-morning quarterbacking. The only other comment is you can affirm on the alternative ground of Scienter, certainly available to this court. Thank you, Your Honors. Thank you very much, Mr. Rubin. Mr. Finkel, you have your back on rebuttal. I appreciate that. First, it's clear to a public investor that the world changed in October 2013. It's equally clear, though, that the world changed for Ameren in July of 2008 when they were told that the whole use of surrogate endpoints with regard to lipid profiles is being reconsidered. Where is that statement, that the whole universe is being reconsidered? I didn't see that. You have a lot of characterizations of what was said that aren't precisely what was said. Well, it is most useful to us to have precise quotes. We are not aware of. We'll provide important information underway. Ameren believed, jealous. I mean, I have the quotes here, and I don't see what you just said. Well, the Accord and Aim High studies are evaluating whether or not lipid profiles other than cholesterol show long-term cardiac improvement. And these studies, while not designed to address this specific gap, will provide important information. So they're reevaluating the use of surrogate endpoints to approve drugs. Is that what that says? That's what it says to me. It says to me that these studies will provide important information. Important information on the use of surrogate endpoints. Right. So we're really awaiting them. We're anxious to see them because it could really be important. There's certainly nothing conclusory one way or another about that. No, but it's important information. And then we know from the record that Accord and Aim High were both unsuccessful, even though the FDA had previously approved the marketing of those drugs based on surrogate endpoints. The drugs on the long-term study, which were post-approval, failed to show cardiac benefit. Mr. Finkel, this question really is one of legal policy, but it certainly goes to the nature of this case and the nature of the arguments that you are advancing. Why shouldn't we be concerned here that what you are really advocating is some kind of continuing reporting requirement of all communications between the FDA and pharmaceutical companies? The FDA cases are no different than any other case. That's not my question. I'm not sure whether that's true or not, but it's still not my question. There is a process here in this type of case where the FDA is involved. So in that respect, it's factually different from any other cases. So, I mean, why isn't that the upshot in the position you've taken? Oh, if you speak to the reporting requirement. If you choose to speak on a subject matter, you have to speak truthfully. Certainly, Amrin could have said that whether or not the long-term reduced study is required to be completed before approval is a matter that we're undergoing conversations with the FDA about, and we're not going to discuss those. He certainly could have said that, and it would have been a true statement, and we wouldn't be here. Perhaps investors wouldn't have bought the stock at the prices that they could pay. Most issuers, when they're doing business with the FDA, say that there's essentially an embargo on discussing our communications with the FDA. Amrin wants it both ways. They want to discuss the communications, they want to discuss them falsely, and then they don't want to be responsible when people lose money on the investments in the stock. If I can briefly, I know that I've taken a lot of time, but three quick points. The study would have been required in Amrin anyway, either as a post-approval study. Which study? I'm sorry, the reduced study would have been required anyway. It would have either been done as a post-approval study, which Amrin wanted to do, and they would get the additional revenue from the drug, or it would have been a pre-approval study as a condition to approval on the drug. It's very different than Sanofi or Pfizer, where the companies, without any regulatory requirements, undertook additional studies. If the companies, Pfizer and Sanofi, determined that the additional studies weren't warranted, they wouldn't have spent the money. So I think there's an element of good faith in Pfizer and Sanofi that isn't present here, because in Amrin they would have had to do the study anyway. If you're still on point one, Mr. Finkel, this isn't quickly. If you were still on point one, you're not moving quickly. Okay, I'm sorry. In Pfizer, Pfizer specifically said you can draw no inference from our moving to phase three. So if anybody thought that they were moving to phase three, it was something good, and they should have disclosed something with regard to phase two. They should be sorely disappointed, because Pfizer specifically said you can draw no assumption by moving to phase three. In Sanofi, the FDA's policy with regard to double blinding never changed, and one of the holdings of Sanofi is that a reasonable investor would know that the FDA prefers double blinding, but in that specific drug, the treatment effect was very large, and pursuant to FDA regulations, if the treatment effect is very large, it doesn't have to be double blinded. Plus, an investor would know that that study was single blinded because of the nature of the drug. It gets administered differently, so it wasn't practical to double blind, because either the physician or the patient would know what drug they were taking. So it was not a question of deceiving an investor, and in that particular case, there were 32 sophisticated opt-out plaintiffs. If I let you go on, I will have permitted the redefinition of quickly, Mr. Finkel. So I think we'll have to close it at that. Thank you. We understand your argument, and I thank you. I think both parties, this is a complicated case. It's certainly complicated in its allegata. We didn't discuss much in the way of legal questions. There are a few there as well, but it was well briefed and well argued, and we thank you very much. Thank you.